```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/08/2013
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
LEONARD W. DEFREECE, JR.,

                Plaintiff,

    -v-

CAROLYN W. COLVIN,[1]
   *Acting Commissioner of Social Security*,

                Defendant.
------------------------------------------------------------------------X

12 Civ. 4641 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

      Plaintiff Leonard W. DeFreece, Jr., brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging a final decision of the Commissioner of Social Security (the "Commissioner") finding him to be not disabled and thus ineligible for both Disability Insurance ("DI") benefits and Supplemental Security Income ("SSI") benefits. Both parties have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. In her papers, the Commissioner contends that the Administrative Law Judge's ("ALJ") decision is supported by substantial evidence. In his, DeFreece argues (1) that the ALJ's decision is not supported by substantial evidence; (2) that the ALJ's decision is contrary to the Act; and (3) that he did not receive a full and fair hearing.

      For the reasons discussed below, the Court concludes that Plaintiff was afforded a full and fair hearing, that the ALJ's decision is free of legal error, and that it is supported by

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Accordingly, the Clerk of the Court is directed to substitute Colvin for Michael J. Astrue, the original defendant in this case, and to conform the official caption of this case to the caption above. *See* Fed. R. Civ. P. 25(d).

substantial evidence in the record. Accordingly, the Court grants the Commissioner's motion for judgment on the pleadings and denies Plaintiff's cross-motion.

## PROCEDURAL HISTORY

DeFreece applied for DI and SSI benefits on November 24, 2008, claiming to have been disabled since November 20, 2008. (R. 16, 93-103). Following the Commissioner's denial of Plaintiff's application on the initial review (R. 51-57), Plaintiff requested an administrative hearing (R. 63). On April 21, 2010, ALJ Dennis Katz conducted a hearing, which was attended by Plaintiff and his counsel. (R. 25-48). After reviewing the case *de novo*, ALJ Katz found that Plaintiff was not disabled (R. 13-24), which became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review on April 4, 2012 (R. 1-5).

## BACKGROUND

Plaintiff was born in 1976 and lived with his mother at the time of his application for benefits. (R. 120, 132). In March 2007, Plaintiff had graduated high school and was attending college when he was assaulted and either stabbed or shot in his right arm, which resulted in a nerve injury. (R. 29-30, 39, 248). The evidence concerning whether Plaintiff was shot or stabbed is contradictory (*compare* R. 29, 152, 187 (stabbed) *with* R. 222 (shot)), and Plaintiff himself has stated "I don't know if I was shot or stabbed" (R. 44). Plaintiff stated that he last worked at an automobile dealership, and that he has not worked since his 2007 arm injury (R. 32-33), but at times he has indicated that he worked both on and off the books in 2008 (R. 97). Plaintiff's disability claims, however, date only to November 20, 2008, a date that appears connected to money Plaintiff owed in child support rather than to the onset of any disability or change in his condition. (R. 39-40).

Plaintiff testified at the administrative hearing that his injury caused excruciating pain, sensitivity to touch, numbness, and muscle spasms. (R. 31-32, 35-36, 41-42). He also testified that he had very limited functioning in his right hand, which prevented him from making a fist, picking up objects that weigh more than five pounds, pushing, pulling, writing, typing, or performing daily activities, such as personal grooming and dressing. (R. 31-32, 35-36).

Plaintiff's claim for benefits stated that he worked from 1997 through November 20, 2008, performing automobile sales and repairs. (R. 125). The claim forms also indicated that the job required writing, handling small objects, and lifting objects up to fifty pounds. (R. 125, 142). After his injury, Plaintiff began using his left hand, previously his non-dominant hand, to become more independent, but he still required assistance for day-to-day tasks, such as brushing his teeth, dressing, and personal care. (R. 133-34). Plaintiff had no problem walking around on his own, was able to use public transportation, pay his own bills, go shopping, and reported that he was planning to get a driver's license at the time of his claim. (R. 135-36). His injury limited his ability to exercise his upper body, but not his lower body, and prevented him from playing football and dribbling a basketball with his right hand. (R. 136). Plaintiff read "all the time," watched television, studied for college classes, went to the library twice a week, attended church, had no problems paying attention or getting along with others including bosses and other people in positions of authority, and could follow written and spoken instructions. (R. 136-38).

Plaintiff was examined by Dr. Neal Dunkelman on May 6, 2008. (R. 222). Dunkelman described Plaintiff's injury as resulting from a gunshot wound. (R. 222). Dunkelman reported that Plaintiff was experiencing right-arm pain, the severity of which he labeled eight to ten out of ten, as well as sensitivity to touch, weakness, and electrical sensation and numbness, specifically in Plaintiff's palm and fingers. (R. 222). Dunkelman prescribed the medications Lyrica and

Percocet for Plaintiff's pain, and saw Plaintiff on approximately a monthly basis through April 2009. (R. 202-25).

On November 20, 2008, Dr. Travis S. Kemp[2] conducted an examination of Plaintiff at the Westchester Medical Center Clinic on behalf of the Orange County Department of Social Services in connection with this application for benefits. (R. 151-52). Kemp found that Plaintiff could not engage in work activities, diagnosed Plaintiff with increased sensitivity and pain in his right forearm as a result of a stab injury, referred him for possible neurosurgery or, alternatively, neuropathic treatment, and noted that he had a poor prognosis for the median nerve injury to the right forearm. (R. 151-52). The record also contains an undated note to a Dr. Bhanisali, that may be from Kemp, suggesting that Plaintiff see a neurosurgeon because he might benefit from peripheral nerve exploration. (R. 227).

On the same date, Defendant claims that Plaintiff was seen by Dr. Asprinio at the Westchester Medical Center's orthopedic clinic. (Def.'s Mem. 4). The pages in the administrative record cited by Defendant concern an examination on that date, but the name Asprinio does not appear, and the examination appears to have been conducted by a nurse rather than a doctor. (R. 187-88). According to the notes, this examination indicated that Plaintiff's pain was a ten out of ten on the pain scale, that his grip was not good, and that his symptoms continued to include pain, tingling, and numbness. (R. 188).

On December 12, 2008, Plaintiff was interviewed by a caseworker in connection with his application for benefits. (Pl.'s Mem. 9-10). That caseworker noted that Plaintiff could barely hold a pen to sign his name to the relevant paperwork. (R. 121).

---

[2] The doctor's last name is not legible on his report, but Plaintiff's memorandum identifies him as Travis Kemp. (Pl.'s Mem. 10).

Plaintiff was examined by Dr. Justin Fernando on January 19, 2009, after a referral from the Division of Disability Determination. (R. 194). Plaintiff reported having been stabbed in the arm in 2007, which resulted in an injury to the right median nerve. (R. 194). He complained of numbness in his fingers and weakness in his right hand, as well as a reduced grip. (R. 194). He had no surgery other than that which repaired the laceration to his forearm. (R. 194). Plaintiff indicated that he needed help showering and washing his hair, but that he was able to dress himself if necessary. (R. 195). Fernando reported that Plaintiff "[n]eeded no help changing for the exam or getting on and off exam table," that Plaintiff was "[a]ble to rise from chair without difficulty," that his "[h]and and finger dexterity are intact bilaterally," and that Plaintiff's left hand strength is "5/5," but that his right hand strength "could not be estimated to any degree of certainty because of poor attempt made by the claimant." (R. 195).

Fernando also reported that there was full range of motion in Plaintiff's elbows, forearms, wrists, and fingers bilaterally, and that there was no sensory abnormality in these extremities. (R. 195). Fernando concluded that Plaintiff "demonstrated no discernible motor or sensory loss as a result of the stab wound," and determined that "[i]f there is any evidence of sensory or motor injury arising from transsection of the nerve in the right forearm, it has to be dealt with on the basis of the EMG and nerve conduction studies," because "[g]ross examination of the right upper extremities shows no evidence either of sensory or motor deficit." (R. 196). As a result, Fernando found that Plaintiff had a "[g]ood/excellent" prognosis. (R. 196).

A note from Dr. Craig Shawn indicates that Plaintiff was seen in the clinic at the Westchester Medical Center on January 21, 2009. Shawn opined that, "based on the evidence available to [him], [Plaintiff] has severe impairment which is expected to and may last at least 12 months." (R. 226).

5

Dunkelman performed nerve conduction and EMG testing on Plaintiff on April 21, 2009. Based on the results of these tests, Dunkelman concluded that there was "[e]vidence of chronic denervation" in a muscle in Plaintiff's thumb, and that the findings were "electrically consistent with a right median neuropathy," likely caused by a wound (which he thought was a gunshot wound) in the right forearm. (R. 209).[3]

Plaintiff was seen by Dr. John Carey on April 12, 2010, and was referred to Dunkelman for pain management treatment. (R. 253). On April 21, 2010, Dunkelman completed a "Medical Source Statement" form for Plaintiff indicating that Plaintiff had no restrictions with his left hand, but had limited use of his right hand. (R. 262). Specifically, Dunkelman opined that, with his right hand and arm, Plaintiff could lift or carry items weighing one to five pounds, handle (i.e., seize, grasp, turn) items, and engage in fingering activities (i.e., picking or pinching) rarely or not at all, and that he could reach only occasionally. (R. 262).

On May 26, 2010, Plaintiff was examined by Dr. Kautilya Puri, after being referred by the Division of Disability Determination. (R. 266). Plaintiff complained of numbness in his fingers, weakness in his right hand, difficulty opening and closing his hand with numbness in his palm and pain in his right wrist. (R. 266). Puri noted that the results of the EMG were consistent with right median neuropathy, but that the level of the injury could not be determined. (R. 266). Plaintiff reported that he did not do any cooking, cleaning, laundry, or shopping, and that he needed help to shower and dress. (R. 267). Puri's examination noted that Plaintiff "[n]eeded no help changing for exam or getting on and off the exam table"; that Plaintiff was "dressed appropriately, maintained appropriate eye contact, and appeared oriented to time,

---

[3]   Dunkelman's clinical notes for several appointments with Plaintiff during early 2009 are mostly illegible, and to the extent that certain words are clear (such as the words "full fist" on page 238 of the administrative record), their import is somewhat unclear. (*See* R. 199-200, 210-21, 224-25, 235-36, 238-42).

person, and place"; that there was "[n]o evidence of delusions or hallucinations," "[n]o indication of recent or remote memory impairment"; that his mood and affect were appropriate; and that there was "[n]o suggestion of impairment in insight or judgment." (R. 267).

Most importantly, Puri noted that Plaintiff's hand and finger dexterity on the right demonstrated a "mildly decreased ability to carry out tasks," that his "[g]rip strength on the right was 4+/5" and that "[i]ndividual muscle strength was stronger." (R. 267-68). Overall, Puri characterized Plaintiff has having "mild limitations to fine motor movements," "[n]o objective limitations for gross motor movements," and "[n]o objective limitations . . . to his activities of daily living on examination today, with mild limitations to gripping on examination." (R. 268).

Puri also completed a Medical Source Statement analyzing Plaintiff's ability to perform certain tasks with his hands. Puri opined that Plaintiff could "[c]ontinuously" lift and carry objects up to twenty pounds, could "[f]requently" lift and carry objects up to fifty pounds, and could "[o]ccasionally" lift and carry objects up to one hundred pounds. (R. 269). She also opined that Plaintiff could sit for up to eight hours and stand or walk for up to six hours in an eight-hour workday. (R. 270). Finally, Puri opined that Plaintiff could "[c]ontinuously" engage in all reaching, handling, feeling, fingering, and pushing/pulling activities with his right and left hands. (R. 271).

## DISCUSSION

### A. Legal Standards

Sections 423(d) and 1382c(a) of the Act define the meaning of "disabled" for purposes of DI and SSI claims. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). They provide, in relevant part, that the Commissioner will find a claimant disabled if he demonstrates the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

7

mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The claimant's impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B). Further, the disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* §§ 423(d)(3), 1382c(a)(3)(D).[4]

The Commissioner follows a five-step process to determine whether a claimant is entitled to disability benefits. *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (alterations omitted) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)). "The claimant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last." *Id.* at 418.

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the

---

[4] Strictly speaking, Plaintiff was eligible for benefits under the two programs for different timeframes. Nevertheless, because the test for disability under the two programs is identical, and because the ALJ found that Plaintiff was not disabled during any timeframe, the Court need not differentiate between the programs and timeframes in its analysis.

[Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  A district court may set aside the Commissioner's determination that a claimant is not disabled, however, "'only if the factual findings are not supported by substantial evidence or if the decision is based on legal error.'" *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (quoting *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotations marks omitted)). "Substantial evidence is 'more than a mere scintilla.'" *Brault v. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).  "It means such *relevant* evidence as a *reasonable* mind might accept as adequate to support a conclusion." *Id*. at 447-48 (internal quotation marks omitted).  It is a "very deferential standard of review — even more so than the 'clearly erroneous' standard." *Id.* at 148 (citing *Dickinson v. Zurko*, 527 U.S. 150, 153 (1999)).

Once the ALJ finds facts, a court can reject them only if "a reasonable factfinder would *have to conclude otherwise*." *Id.* (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).  Put another way, "it is up to the agency, and not this [C]ourt, to weigh the conflicting evidence in the record," *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998), and thus, "[w]here there is substantial evidence to support either [the Commissioner's or the Plaintiff's] position, the determination is one to be made by the factfinder," *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990); *see also Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) ("Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." (internal quotation marks omitted)).

9

**B. Analysis**

The ALJ ruled in Plaintiff's favor on the first two stages of the disability evaluation process, finding that Plaintiff was not then employed and that his right-arm injury and obesity constituted "severe" impairments. (R. 18-19). The ALJ found that Plaintiff's impairments did not meet or medically equal one of the listed impairments in Appendix 1 of the regulations, specifically finding that Plaintiff's impairments did not meet the definition of Listing 1.08 because "the objective medical evidence of record does not support a finding that the claimant continues to require surgical management of his dominant right upper extremity." (R. 19). The ALJ noted that while Plaintiff "alleged essentially full loss of the use of this extremity," those claims were "not supported by the objective medical evidence of record, which show[ed] only mild limitations of functioning." (R. 19). At the fourth stage, the ALJ found that Plaintiff was unable to perform his past work. At the fifth stage, however, the ALJ found that Plaintiff retained sufficient residual functional capacity, in combination with his age, education, and previous work experience, to perform light work, and thus, that Plaintiff was not disabled under the Medical-Vocational Guidelines. (R. 19-24).

This decision is plainly supported by substantial evidence in the record. The ALJ relied primarily upon the findings of Fernando and Puri, who found only mild limitations in Plaintiff's functional abilities. (R. 21-22). For instance, both Fernando and Puri noted that Plaintiff did not need help changing or getting on and off the examination table. (R. 195, 267). Fernando also found that Plaintiff "demonstrated no discernible motor or sensory loss as a result of the stab wound." (R. 196). Puri noted that Plaintiff had only a "mildly decreased ability to carry out tasks," as a result of reduced right-hand and finger dexterity, and that his "grip strength was 4+/5." (R. 267-68). She further found that he had only "mild limitations to fine motor

10

movements," "[n]o objective limitations for gross motor movements," and "[n]o objective limitations . . . to his activities of daily living on examination today, with mild limitations to gripping on examination." (R. 268). Most importantly, Puri conducted a functional evaluation, and concluded that Plaintiff could "[c]ontinuously" lift and carry objects up to twenty pounds, could "[f]requently" lift and carry objects up to fifty pounds, and could "[o]ccasionally" lift and carry objects up to one hundred pounds, as well as sit, stand and walk for periods of time consistent with a normal workday. (R. 269-70).[5] These findings by Fernando and Puri are plainly a sufficient basis for the ALJ's conclusion that Plaintiff could perform light work.

The fact that Plaintiff's treating physician, Dunkelman, believed Plaintiff to be more limited does not call for a different conclusion, as an ALJ is not required to give a treating physician's opinion controlling weight where it is contradicted by other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(c)(2). The ALJ in this case expressly referenced the factors in 20 C.F.R. § 404.1527(c)(2) (*see* R. 19, 22), and explained that Dunkelman's report on Plaintiff's condition around the time of the hearing consisted only a "check off" form based on Plaintiff's self report, while the opinions of Puri and Fernando, on which the ALJ relied, were the product of in-depth examinations as evidenced by detailed, narrative reports (R. 22). The ALJ also noted specific, objective medical evidence — namely, the absence of any atrophy of the upper right extremity — that belied Plaintiff's claims and Dunkelman's finding that the arm had lacked functional capacity for many years. (R. 22). These constitute "good reasons" for disregarding the treating physician's opinion, *Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir.

---

[5] Plaintiff questions the credibility of Puri's statement that Plaintiff needed no help changing for the examination on the ground that he would not have needed to undress to examine his right forearm, especially in light of the hot weather on the day of the examination. (Pl.'s Mem. 8). Putting aside the tenuous nature of this attack on Puri's credibility, however, the record makes clear that she examined Plaintiff's neck, back, and other extremities, which plainly would have required Plaintiff to change clothes. (R. 268).

2004), and because "it is up to the agency, and not this [C]ourt, to weigh the conflicting evidence in the record," there is no basis to disturb the ALJ's findings, *Clark*, 143 F.3d at 118.

Plaintiff's other arguments are also unavailing. First, Plaintiff asserts that the ALJ "could not possibly remember" him because there was a three-and-a-half-month gap between the hearing and the issuance of a decision, and the ALJ conducted several hearings every day. (Pl.'s Mem. 8). Plaintiff cites no evidence, however, to support this gratuitous claim, which is belied by the thorough and well-reasoned nature of the ALJ's analysis and his extensive citation to, and discussion of, the evidence in the record. Plaintiff also attacks the ALJ's finding that he lacked credibility. (Pl.'s Mem. 8-9). But the ALJ's finding — that Plaintiff's claims were not consistent with the objective medical evidence in the record (R. 22) — is supported by substantial evidence in the record, including the evidence discussed above.

The ALJ also identified two significant inconsistencies in Plaintiff's evidence and testimony: first, Plaintiff reported that his right-arm injury had occurred in three different years — 2006 (R. 266), 2007 (R. 29), and 2008 (R. 152); and, second, Plaintiff reported to some doctors that his injury was the result of a stabbing (R. 39, 152, 187), to others that it was the result of a gunshot (R. 222), and, at the hearing, testified that he was not sure how he was injured (R. 44). Moreover, the ALJ noted Fernando's observation that Plaintiff had demonstrated "poor effort" when attempting to measure Plaintiff's right-grip strength, which suggested symptom magnification (R. 21), and further called into question the severity of Plaintiff's impairment. Finally, Plaintiff's own testimony suggests that he filed for disability benefits because of child support payments that he owed, rather than as a result of his injury. (R. 40). This evidence is more than sufficient to support the ALJ's finding that Plaintiff lacked credibility. *See, e.g.*, *Snyder v. Barnhart*, 323 F. Supp. 2d 542, 546-47 (S.D.N.Y. 2004) (upholding an ALJ's adverse

credibility finding based on discrepancies in the plaintiff's testimony and discrepancies between that testimony and the medical evidence).[6]

Next, Plaintiff contends that his impairment should have been found to functionally equal Listing 1.08 of Appendix 1. To meet or functionally equal Listing 1.08, however, a soft tissue injury must be "under continuing surgical management," meaning "surgical procedures and any other associated treatments related to the efforts directed toward the salvage or restoration of functional use of the affected part." 20 C.F.R. Part 404, Subpart P, Appendix 1 Listings 1.00M, 1.08. Here, although Plaintiff claims that he "continues to be under continuing treatment with the hope of restoring function of the right upper extremity" (Pl.'s Mem. 14), there is no evidence that he has required surgery since the closing of the laceration sustained in March 2007 and no evidence that further surgical procedures are necessary or expected. (R. 194). Kemp's referral of Plaintiff for "possible neurosurgery" (R. 151) and a note (possibly from Kemp as well) suggesting that Plaintiff might benefit from surgical intervention (R. 227), without any evidence that surgery actually took place or is anticipated in the future, are insufficient to reverse the ALJ's finding that Plaintiff's condition did not meet or medically equal the listing.

Finally, Plaintiff argues that the ALJ erred in finding that he could perform light work without consulting a vocational expert. (Pl.'s Mem. 14). Where a claimant suffers only from

---

[6] Plaintiff fails to argue that the ALJ erred in not expressly considering the factors set forth in 20 C.F.R. § 404.1529(c)(3) when weighing his credibility, and therefore waived any such argument. *See, e.g.*, *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) (holding that in Social Security cases, the Second Circuit's "statutory mandate as an appellate court is the same as that of the district court"). In any event, the fact that an ALJ did not "expressly consider" the factors in that regulation "is not grounds for remand where," as here, "the reasons for the ALJ's determination of credibility are sufficiently specific to conclude that he considered the entire evidentiary record in arriving at his determination." *Judelsohn v. Astrue*, No. 11-CV-388S, 2012 WL 2401587, at *6 (W.D.N.Y. June 25, 2012) (internal quotation marks omitted); *see also Cichocki v. Astrue*, No. 11-CV-755S, 2012 WL 3096428, at *8 (W.D.N.Y. July 30, 2012) (stating that the ALJ's failure to "walk through each of the factors in his decision" did not warrant remand).

exertional limitations, an ALJ may properly look to the Medical-Vocational Guidelines to determine whether a claimant is disabled. *See, e.g.*, *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986). The "mere existence of a nonexertional impairment," however, "does not automatically . . . preclude reliance on the guidelines." *Id.* at 603. Instead, an ALJ must consult a vocational expert only where a claimant has a nonexertional limitation that "significantly limit[s] the range of work permitted by his exertional limitations," *id.* at 605 — namely, "when it causes an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity,'" *Zabala v. Astrue*, 595 F.3d 402, 411 (2d Cir. 2010) (quoting *Bapp*, 802 F.2d at 605-06). Here, ALJ Katz found that Plaintiff's additional limitations had "little or no effect on the occupational base of unskilled light work" (R. 24), a finding that Plaintiff does not challenge as he complains only that the ALJ did not consider the exertional limitations identified by Dunkelman. (Pl.'s Mem. 13-14). Accordingly, there was no need for ALJ Katz to consult a vocational expert.[7]

## CONCLUSION

The Court has reviewed the entirety of the record and concludes that the ALJ's decision was based on a full and fair hearing, was free from legal error, and is supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings is

---

[7] In his application, Plaintiff also made claims on the basis of mental impairments, which the ALJ found to be not severe. (R. 18-19). Although Plaintiff appealed this finding to the Appeals Council (R. 181-83), and the parties note facts concerning Plaintiff's mental status in their briefs (*see* Def.'s Mem. 8-9; Pl.'s Mem. 12-13), Plaintiff makes no argument concerning the ALJ's mental impairment finding in his briefing before this Court. Accordingly, the Court deems the issue waived. *See, e.g.*, *Poupore*, 566 F.3d at 306. In any event, the Court has reviewed the ALJ's finding and concludes that it is supported by substantial evidence.

GRANTED and Defreece's cross-motion is DENIED.  The Clerk of the Court is directed to terminate the motion (Docket No. 12), and to close the case.

    SO ORDERED.

Dated: August 8, 2013
       New York, New York

                                              JESSE M. FURMAN
                                           United States District Judge